Good morning, and may it please the Court. My name is Rebecca Kelly, and I am appearing on behalf of Michael Mickey Fradiue, the petitioner-appellant in this matter, under the supervision of Carolyn Wiggin, Assistant Federal Defender for the Eastern District of California. May I please reserve two minutes for rebuttal? Certainly. Mr. Fradiue was subjected to substantial restraints on his freedom over and above those normally associated with inmate status when he was placed in the segregated housing unit in California State Prison, Sacramento. Mr. Fradiue was on lockdown 23 hours a day. He lost his ability to move outside his cell without handcuffs and a guard escort. He lost access to the day room and the large recreational yard, and was deprived of all of his property, as well as the ability to and privilege of having personal items within his cell, such as TVs, radios, and other personal hygiene items. Mr. Fradiue was not allowed to return to his general population cell, regaining his property, familiar surroundings, and usual prison privileges until the charges against him that led to his placement in this segregated housing unit were resolved. Under clearly established --" All of this is true. We understand exactly what you're talking about. But the standard of review is what's the problem in this case from your standpoint. What is the standard of review that we're supposed to apply to this? The standard of review that we are applying in this case is whether or not the Third DCA unreasonably applied clearly established Federal law in rendering its decision. And why do you think that that happened? I mean, we know the facts of his confinement, but why do you think it was unreasonable? Yes, Your Honor. The reason that the Third DCA was unreasonable in this case was that it held that under the totality of the circumstances presented, no restraints were placed upon Mr. Fradiue to coerce him into participating in the interrogation over and above those which are normally associated with regular inmate status. That's unreasonable, Your Honor, because Mr. Fradiue was in administrative segregation, this segregated, restricted environment that was a restraint over and above that normally associated with regular inmate status. How long had Mr. Fradiue been in AGSEG? Approximately one month by the time that the investigator came to speak with him. And does that matter with respect to our analysis on the fact that he had been there a month and that was what happened was no less restrictive than what he had been living under for a month? No, Your Honor. Courts have found that one can be in custody for Miranda purposes in their own home. And the amount of time, if anything, really tends to increase the inherently coercive nature of this, of ---- But he was able to walk around. There was someone else in the cell. He didn't have to talk to the officer that came by. I'm just trying to figure out. That's very different from someone who is taken directly from the scene to a holding cell or to an interrogation room, and isn't that what we're supposed to consider? Yes, Your Honor. To your first point, in House ---- in the recent Supreme Court case of House v. Fields, the Court noted that fellow inmates are by no means necessary friends. In fact, you know, the fact that Mr. Fradiue had an AGSEG cellmate tends to increase the coercive nature of this interrogation, because Mr. Fradiue was left with the opportunity of either admitting to possessing the heroin or ratting out his cellmate in front of him. That's not really true. He could have said, I have no idea who that heroin belonged to. I mean, you create two possibilities. There's another one. He could have said, I have no idea who the heroin belonged to. Right. But that wouldn't have ---- that's true, Your Honor. However ---- It wasn't between a rock and a hard place in the sense that you describe it. Cellmate wasn't the same cellmate from before, was it? Or was it the same cellmate? Maybe I misunderstood that. No, Your Honor. It was a different cellmate. And moving on to your point about this wasn't the, you know, classic Miranda situation where someone is taken from the street, deprived of their property, and then placed in a holding cell until either trial or some sort of interrogation. That's exactly what happened in this case. Mr. Furdue was living a normal life in general population. He was taken from his cell. He was strip-searched. He was deprived of all of his property. He was placed in this inherently coercive, restricted environment where he was held at the liberty of the State to be interrogated and investigated with regards to this additional case. Does it matter that this was an investigative person? Callahan wasn't your regular sort of a police officer. Does that make any difference in this case? It's still a State actor that's asking ---- So it makes no difference? Under my understanding of the case law, Your Honor, it is just that it is a State actor that is enlisting an incriminating response. What is your best case, or what are your best cases that you think supports your position that this was unreasonable? The clearly established Federal law in this case is Miranda v. Arizona. Although Mathis is illustrative because it did state that prisoners in prison inmates can be in custody for Miranda purposes, the testimony ---- But they're not necessarily in custody for Miranda purposes. Certainly. It's not dispositive. Is Howe's relevant? Howe's is relevant in illustrating how Miranda is to be applied, in the sense that it is really a totality-of-the-circumstances test. But to go back to the Third DCA opinion, what the Third DCA said was that under the totality-of-the-circumstances presented, no additional restraints over and above those which are normally associated with inmate status were placed on Mr. Furdue. We have to look at what is normally in ---- what an inmate's normal level of restraint is within general population, and compare that to the administrative segregation unit. Where is the ---- do you have a case that says that, that you have to compare general population to ad seg, that that's a factor? No, Your Honor. But under the totality-of-the-circumstances test, we have to look at the additional restraints that Mr. Furdue was subjected to. So are you advocating a rule, a per se rule, that any time that an interrogation takes place in ad seg, that it's custodial for Miranda purposes? No, Your Honor. Then what interrogation in ad seg would occur that would not violate Miranda, in your view? For example, if someone is in administrative segregation for protective custody, if they took ---- if they were there on their own, you know, on their own choosing, for example. But this additional restraint, which is, you know, the fact that these inmates are restricted on their movement, they cannot leave their cell without a guard escort and being in handcuffs, they don't have their personal property that's taken from them, they're further restricted on personal items such as TVs, radios, and other personal hygiene items. They do not have the access to the day room like normal prisoners, and they can't visit the large yard. Those are all additional restraints that were placed upon Mr. Furdue that are over and above a regular inmate's status, and which, therefore, under the totality of the circumstances, demonstrates that he was in custody for Miranda purposes. Was he free to terminate the interview any time he wished? According to Officer Callahan, yes, but Mr. Furdue was not made aware of that fact. What did he say about what his knowledge of that factor was? What I believe is relevant, Your Honor, is that Officer Callahan testified that he asked Mr. Furdue if he objected to him as his investigative employee, but Officer Callahan, who was investigating Mr. Furdue in administrative segregation, never told Mr. Furdue that he had a right to refuse to talk to him. Did he later testify that he knew that he could have walked away and terminated at any time? Yes, Your Honor, but that doesn't demonstrate to us of what Mr. Furdue knew at the time of the interrogation, which is relevant. Isn't it a fair inference that he was talking about what he knew at the time of the interrogation? He didn't say, I just found this out recently. I mean, this is a man who's been in and out of prison many times. I mean, they tend to be more sophisticated than your regular person right off the street. Isn't it a fair inference, isn't it a reasonable inference that he was talking about what he knew at the time? He understood that he was free to terminate whenever he wanted? Your Honor, I think it cuts both ways. I think it could go either way, and the fact of the matter is that Officer Callahan testified that, yes, Mr. Furdue had the ability to refuse to talk to him, but that's not what he told him at the time of the interrogation. And at the time of the interrogation, if we're looking at Mr. Furdue's subjective intent, which isn't really relevant to the custody analysis, Mr. Furdue wanted to talk to this person with regard to his property. You know, so what we're really looking at is whether or not the Miranda rights, which are – which one is entitled to when they're subjected to an additional restraint upon their freedom, in order to make sure that they understand their rights with regards to talking or not talking. And the fact is that Mr. Furdue was not told that he had a right to refuse to talk to Officer Callahan. And Mr. Furdue was never told that he had a right to refuse him or any other investigative employee assigned to the case. Roberts. Thank you, counsel. Thank you. Good morning. May it please the Court. Sean McCoy, deputy attorney general for Respondent. The State supreme court reasonably rejected this claim, or I should say the rejection of this claim was not. This was a State supreme court decision? The State supreme court rejected it in a petition for review. The third district issued the merits decision. And that's the one we review, right? Yes. That's the last reasoned decision. Correct. Yes. The --"a totality of circumstances approach is consistent with the case law in Miranda, certainly with respect to application of Mathis and the fact that there is no per se rule that someone is who is incarcerated is in custody for Miranda purposes. In this court's decision in Cervantes, the court adopted a totality of circumstances approach focusing on the language, the physical surroundings, the extent to which the inmate is confronted with guilt, and whatever additional pressures, coercive pressures were exerted on the interrogation. The subsequent supreme court decisions, Howes v. Fields and Maryland v. Schatzer, don't necessarily apply because they're subsequent to the State court decision, but they certainly don't necessarily apply or they don't apply, period. They don't apply, but they certainly inform the decision because in Howes, the Supreme Court also adopted a totality of circumstances approach saying first we're going to determine whether in light of the object of circumstances of the interrogation a reasonable person would have felt free, that he was not at liberty to terminate. So what do you mean by inform? How are we supposed to take Howes? How is that supposed to inform our decision? The reason I ask is often the States have said, look, you have to look at the law as it was at the time, period. You've got to put blindfolds on as to the future. So do we ignore Howes? Or if not, then on what basis would we cite it? I don't. Well, I mean, you cite Cullen v. Penholder for the proposition that we took at the law at the time. Yes. Not subsequent development. Yes. And that's appropriate, which means you look at the law that existed up until that time. Isn't Howes completely irrelevant? Howes is irrelevant. Okay. You say in your brief that he was an appellant was informed and acknowledged he was not obligated to say anything. The reply brief says that's simply not wrong. I would direct Your Honor's attention to excerpts of record, Volume 2, 91, 92, 90 through 92. Officer Callahan explained what he did when he contacted the defendant. He explained his routine. I would also direct Your Honor's attention to that. Well, what did he say? He stated that he informed. And are you paraphrasing or reading? I'm paraphrasing. I don't like paraphrasing. Paraphrasing is almost always wrong. Spin. Well, 90, excerpts of record, Volume 2, 90, at line 21, first of all, we have to let the inmate know we are acting as a fact finder. Okay. You have the right to refuse a particular officer. All right. Where does it say not obligated to say anything? The first thing, which is my normal routine, this is page 91, is to let the individual know my name and that I'm acting as fact finder. I don't think it's there. It's not there. It's on page 104. On 104, but the inmate who is charged may cooperate or may not cooperate, depending on his own choosing. That's correct. Oh, does that, in the context of I told him? Or is he just describing the general situation? You say he was informed and acknowledged. He was not obligated to say anything. I couldn't find that. And the other side says it doesn't exist. Well, Officer Callahan described his normal routine, what he performed. The defendant himself, Appellant himself, testified that he was aware of it. It's reasonable to infer that Callahan had informed him. You don't have to speak with me. You can request an additional officer if you want. But regardless of that fact, what I think is more significant is Excerpts of Record 109, line 22. The only reason I requested an investigating employee, this is the Appellant talking at the hearing on the motion to suppress, 111, he's aware he could decline to speak with the investigating employee. He requested an investigating employee because he was concerned about his property. So there's a fact in the record that shows that not only was he aware that he didn't have to speak to Officer Callahan, he requested to speak to Officer Callahan. In light of that fact, it's difficult to see how this is a coercive, coerced interview when he requested to speak to the investigating officer. He was aware and said so. He said because the only way you can get your property back is to get an investigating officer involved. He still requested to speak to the officer. Sotomayor, it seems like this case turns on whether there was additional restrictions placed on the Mr. Freddo in this circumstance. Do you agree? I mean, based on Miranda and Cervantes, is that correct? Additional coercive pressures consistent with the type of jailhouse interrogation that occurred in Miranda, I would agree that that is the analysis. I don't believe that those facts are present here. Well, I don't think so. Yeah. Well, I know you probably don't agree with that, but let me just ask you, I mean, what's a little concerning here is that he was placed in Ag-Seg while they investigated this whole drug charge. Is that correct? I mean, this whole drug presence in his former cell. And while he was in Ag-Seg, it appears that he was his freedoms were more limited there because of the nature of Ag-Seg. And it looks like they were questioning him directly related to the reason that he was placed in Ag-Seg. And so I'm just curious if you think that those facts don't turn this question into a really close one as to whether or not he was being interrogated and needed to be informed of his Miranda rights. No. He was placed in administrative segregation immediately following the discovery of the contraband. This was on June 26th. He was kept there. Admittedly, he's kept there during the pendency of the 115 prison code regulation investigation to determine where he shall be housed subsequently. As a result of the fact that he has the contraband, the purpose of the hearing of the investigating employee while the inmate is in administrative segregation is twofold. It is to gather facts for the hearing officer, but it is also to assist the defendant, the, in this case, appellant, to determine what facts he wishes to present to the senior hearing officer. Don't you think that's a little bit odd in terms of Miranda analysis? I mean, in a typical interrogation, it's clear that the officer is representing the state and querying the suspect. Here, you have a person who's designated essentially to represent both sides, and he says, not I'm here to investigate a crime, but I'm here as a fact finder. So the defendant in this case really was not on notice that there was a possibility that he was going to face criminal charges outside the context of the prison, was he? That's unclear, but certainly for purposes of Miranda, he was aware that he was not compelled to talk to Officer Callahan for any purpose. And how do you know that? We don't see it in the record except for the routine that he usually says you don't have to cooperate. Well, if you don't, if you aren't prepared to draw the inference from Officer Callahan's statements, which the state court did, you certainly have appellant's own testimony that he was aware of that fact. And you have the additional fact, which was not specifically cited by the state court, but which is in the record, that he requested Officer Callahan. And at what point did he realize that he could ask for an attorney? I'm not aware that he was, at what point he was aware of that. Certainly within the 115 process, this is an administrative process to determine placement based on the status and the contraband. I believe I'm about out of time. Well, I have one more question, if you don't mind. Could being in AGSEG during an interrogation ever constitute being in custody for purposes of Miranda? Is there a scenario? By itself, the mere fact that somebody is in administrative segregation, I would submit that on that fact alone, no. But is there a scenario, though, where you could be in AGSEG and be subject to Miranda? I suppose that there could be a factual scenario that could result in that contributing to other facts to make it a custodial interrogation. Certainly in this case, you have a defendant who's being interviewed by a fact finder. And it didn't strike me from the record that he ever understood that he was in jeopardy of hitting a three strikes and being in prison for life, depending on the answers that he gave. I don't believe that there's the fact that he's aware that the statement can someday be used against him for some other purposes necessarily renders it a custodial interview. There's the Miranda is designed to protect against a specific type of interview and coercive pressures that result from it, not the mere fact that one is aware that his statements will be used against him at some future point because they happen to be made to a law enforcement officer. Are there any further questions? No. Thank you. Thank you very much. All right. Let's put two minutes on for rebuttal. Thank you, Your Honors. Persons that are subjected to interrogation are always free to stop talking. The reason Miranda warnings are required is because some people subject to custodial interrogation may not know of their right to remain silent or may know of their right but be too intimidated by the custodial setting to invoke it. Mr. Furdue's testimony at the suppression hearing that he could have gotten up, quit talking and moved away from his cell does not indicate whether Mr. Furdue knew that at the time of the interrogation. Your opponent says that he requested this investigation or this investigating officer. Did you hear that? Yes, Your Honor. And do you have any response to that? Yes, Your Honor. Nothing in Mr. Callahan's testimony suggests that he went to speak to Mr. Furdue because Mr. Furdue requested him. That was standard procedure in any ---- What about what Mr. Furdue said? Mr. Furdue requested and testified that he requested an investigative employee, which isn't clear according to Mr. Callahan's testimony, but he ---- But Mr. Furdue seems to have wanted this kind of a discussion. Doesn't that mitigate against your argument that he was in custody? Certainly not, Your Honor. Mr. Furdue wanted to ---- Or that the circumstances were coercive and compulsive? If he wanted to talk to an investigative person, doesn't that cut against your argument? Your Honor, Mr. Furdue didn't necessarily want to have the conversation that he had. Doesn't necessarily mean? Well, you asked whether or not Mr. Furdue wanted to have this kind of conversation. What Mr. Furdue wanted, which is clear in his testimony at the suppression hearing, is to speak to someone about his property. He didn't request to speak to ---- He said he understood that in order to do that, he had to clear up the drug thing. Mr. Furdue did not request an investigative employee to speak about the crime. He requested an investigative employee to speak about the property. And it is important in a case where this investigative employee, a representative of the State, who is interrogating someone who is placed in ADSEG as a ---- in order to make him available to the State for this kind of interrogation, tell an inmate that he has a right to remain silent and that he has a right to an attorney. Those are important rights that Miranda says that anyone taken into custody or otherwise deprived of their freedom by the authorities in any significant way and is subject to questioning is entitled to. Now, in this case, it is clear that in ADSEG, Mr. Furdue was deprived of his freedom in a significant way over and above that regularly ---- Did it make any difference that the investigating officer was separated from Mr. Furdue by a door and they could have just walked backwards from the door? Is that a factor that we take into consideration? There weren't in the same room. That's right, Your Honor. Furdue wasn't taken out and put in a separate room for this. Certainly, Your Honor. But if Mr. Furdue in ADSEG is not custody, what more do we need? Do we need the ---- It was custody. I mean, he was in custody. But what was there in addition to the custody when the guy is outside the door and not in the room? Mr. Furdue was in ADSEG. I mean, that is the additional restraint upon his freedom. Then you go back to what Judge Thomas was worried about. You're asking for a bright-line rule that all ADSEG is custody for custody purposes under Miranda. I don't think that's true, Your Honor. And the reason is because ADSEG in and of itself is not the problem. It's the fact that someone is whisked away from their home in general population, they're strip searched, they're deprived of their property. Well, that's what ADSEG is. Pardon? That's what ADSEG is for the vast majority of people in ADSEG. For the vast majority, yes, Your Honor. So you're saying for those people, then it's they're in custody for Miranda purposes, period. Your Honor, we are not asking for a new rule. We're asking for a totality for this Court to find that the third DCA unreasonably applied, clearly established Federal law, which is a totality of the circumstances test, which asks whether or not an inmate is subjected to additional restraints over and above those normally associated with inmate status. And in this case, Mr. Furdue was subjected to additional restraints over and above those normally associated with inmate status because he was deprived of his property, he was on lockdown 23 hours a day, no access to the day room, no access to this large yard, and restricted on other items. Your time has expired. Thanks. We gave you a little extra. I have one question. Where do you go to law school? I went to Pacific McGeorge in Sacramento. You're out now. I am. Did you write the briefs? I assisted with writing the briefs. Well, it won't make any difference with respect to how we decide the case, but the briefs were well done. Congratulations. Thank you, Your Honor. The case is heard. It will be submitted for decision. Thank you all for your arguments.
judges: Trott, Thomas, Murguia